IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


JACK E. SHOCK,                          :

                    Plaintiff           :        Civil Action 2:08-cv-630

        v.                              :        Judge Sargus

COMMISSIONER OF SOCIAL                   :        Magistrate Judge Abel
SECURITY,
                                        :
                    Defendant


## REPORT AND RECOMMENDATION


Plaintiff Jack E. Shock brings this action under 42 U.S.C. §423 for review of a

final decision of the Commissioner of Social Security denying his application for

disability insurance benefits.  The matter is before the Magistrate Judge for a

report and recommendation on the disposition of this matter.


### Summary of Issues.

Plaintiff Jack E. Shock filed an application for disability insurance benefits

on December 16, 2004, alleging that he had been disabled since June 15, 1999, at

the age of 45, by degenerative disc disease of the cervical spine and carpal tunnel

syndrome.  (His last date of insured status was December 31, 2004.)  The

administrative law judge ("ALJ") found that, although Plaintiff's spinal

1

degeneration and carpal tunnel syndrome were severe impairments, they did not, before December 31, 2004, prevent either effective ambulation or the ability to perform fine and gross movement with the upper extremities. He also found that Plaintiff had, as of December 31, 2004, the residual functional capacity to perform light work except for overhead lifting and forceful gripping. Plaintiff objects to the Commissioner's decision, arguing that the record demonstrates that he has no functional use of his hands, and that the ALJ misrepresented his testimony that he had the ability to work with a computer.

**Procedural History**.  Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability beginning June 15, 1999. The claim was denied initially on April 15, 2005, and upon reconsideration on September 2, 2005. (R. 17.) On December 20, 2007, a hearing was held, at which Plaintiff was represented by counsel. On February 7, 2008, the administrative law judge (ALJ) issued a decision denying Plaintiff's claim. (R. 17-25.) Plaintiff timely filed this action.

**Age, Education, and Work Experience**.  Shock was born on December 18, 1953. (R. 50.) At the time his insured status expired, he was 51 years old. He graduated from high school in 1973. (R. 228.) His last employment was in heavy equipment maintenance at a warehouse. (R. 73.) He had past work experience as a welder and order picker. (R. 76, 122.)

**Plaintiff's Testimony**.  The administrative law judge did not extensively

address Shock's testimony at the hearing.  He did, however, note in his decision:

> The claimant alleged that he is disabled secondary to difficulty using
> his hands and uses both hands to hold his cup.  He has no problems
> bending, sitting, or standing and stated that he has no residual
> difficulty due to his neck surgery.  His only problem is using his hands.
> He had a heart attack and a stent was placed in September of 2005.
> He continues to smoke 1-1/2 packs of cigarettes per day.

(R. 22.)

> In addition, he stated:

> The claimant has a history of neck surgery and carpal tunnel
> syndrome, but this is adequately accounted for by precluding overhead
> lifting and forceful gripping activities.  The claimant alleged that he
> has significant difficulties using his hands, but reported to Dr.
> Thompson that he spends a typical day working on his computer.  He
> did not testify to significant difficulty with fine or gross manipulation.
> Further, a Functional Capacity Evaluation in October of 2005 was
> consistent with the ability to perform sedentary and light work activity
> with no overhead lifting.  The claimant reported no residual affects
> [sic] from his neck surgery and stated that he is able to sit, stand, and
> bend without restriction.  He did not testify to any special measures he
> utilizes to easy his alleged pain or functional difficulty.  No physician
> or other source has reported that he is disabled.  Finally, as set forth
> above, the claimant underwent an evaluation to assess his physical
> capacity and this evaluation was consistent with the reduced range of
> light work set forth above.

(R. 23.)

According to the transcript of the hearing, Plaintiff testified that "my hands

will just go numb and then they'll just, from the shoulder down, they'll just go

completely dead." (R. 229.)  He stated that "I can't depend on my hands. [...] So I

can't drive and I can't do much of anything when I can't use my hands." (R. 229.)

Plaintiff testified that the episodes of numbness did not cause him pain, but rather

3

"[i]t goes completely numb.  I can't even tell they're there."  (R. 230.)  He stated that he can write if he has feeling in his hands, but that his wife has to assist him with using the telephone by laying it upon his shoulder.  (R. 230.)  In response to the ALJ's inquiry whether he could carry a gallon milk container, Plaintiff noted that he has, at times, trouble exerting enough force on the door handle to open a refrigerator.  (R. 232.)  In summary, he testified, "[t]here's no warning.  I never know when it's going to do it. [...] It could last 10 or 15 minutes and it could last a couple hours.  It's, it's like I said, very undependable."  (R. 233.)  During such episodes, Plaintiff testified, his hands were useless.  (R. 233-234.)

### Medical Evidence of Record.

This Report and Recommendation will summarize the medical evidence of record in some detail.[1]

### Physical Impairments.

<u>August 10, 2004 Electromyographic Examination</u>.  Dr. Thomas D. Skeels, D.O. conducted an electromyography of Plaintiff on August 10, 2004.  He found evidence of moderately severe carpal tunnel syndrome in Plaintiff's right wrist.  No denervation was seen, and Plaintiff's ulnar nerve study was normal.  However, Dr.

---

[1]The medical evidence relevant to the present analysis deals only with Plaintiff's history of neck, hand, and spinal conditions, and carpal tunnel syndrome.  Plaintiff has not challenged the Commissioner's decision with respect to any condition other than those afflicting his hands and arms.

Skeels advised Plaintiff to get a surgical consult for a carpal tunnel release. (R. 125.)

Michael Morehead, M.D. On November 1, 2004, Dr. Michael Morehead examined Plaintiff. He diagnosed Plaintiff with bilateral carpal tunnel syndrome, right ulnar sensory neuropathy, and denervation to his right triceps muscle, probably caused by C7 radiculopathy. (R. 208.)

November 13, 2004 Cervical MRI. Dr. Debra Byler conducted a cervical MRI of Plaintiff on November 13, 2004. The MRI revealed mild congenital spinal canal encroachment with no neural impingement at C2-3, mild to moderate central canal stenosis and mild left foraminal encroachment at C3-4, marked central canal stenosis at C4-5, marked central canal stenosis with mild to moderate bilateral foraminal encroachment at C5-6, and severe acquired spinal canal stenosis with mild bilateral foraminal encroachment at C6-7. Dr. Byler noted "refer to neurosurgery [...] Tell him damage can progress and he needs to keep this follow-up." (R. 200.)

Dr. Rammy S. Gold, M.D. On January 11, 2005, Dr. Gold saw Plaintiff in consultation. Dr. Gold noted that Plaintiff had a "several year history of significant arm pain and diffuse arm numbness", and that "[h]e has an intermittent loss of strength with the arms, especially during physical activity." (R. 196.) Plaintiff's range of motion of the cervical spine was normal, and he was in no acute distress. His strength was 5/5 throughout, and he had a nonanatomic loss of pin prick sensation in his upper extremities. (R. 196.) Dr. Gold noted that Plaintiff's MRI

scan showed very prominent disk/osteophyte complexes at C5-6 and C6-7, causing significant canal and foraminal narrowing, and mild midline stenosis at C4-5.  He noted that Plaintiff's electromyographic examination was suggestive of both a carpal tunnel process and a probable radiculopathy.  His opinion was that Plaintiff's condition was predominantly due to cervical disk disease at C5-6 and C6-7, and noted that he should consider an anterior cervical diskectomy and fusion at C5-6 and C6-7.  (R. 196-197.)

On February 9, 2005, Dr. Gold performed an anterior cervical diskectomy and fusion at C5-6 and C6-7, to treat cervical stenosis.  Dr. Gold's notes described Plaintiff's history as "complains of severe numbness and intermittent pain with weakness in the arm."  Plaintiff tolerated the procedure well, and was discharged the next day.  (R. 128-130.)

On March 22, 2005, Dr. Gold examined Plaintiff for a follow-up to his surgery.  At the time, Plaintiff complained of ongoing posterior cervical pain with radiation into the retroscapular region, and of ongoing pain and numbness traveling into the arms.  His strength was normal.  (R. 194.)

On October 25, 2005, Kelly P. Cummings, MS, PA-C, of Dr. Gold's office examined Plaintiff for another follow-up.  Plaintiff reported no improvement of his bilateral arm weakness and numbness.  (R. 190.)

On February 7, 2006, Dr. Gold again examined Plaintiff for a follow-up.  He noted that Plaintiff had undergone bilateral EMG studies of the upper extremities, and that the results were worse for persistent numbness on the left in the third,

fourth, and fifth digits.  He found strength intact throughout, with the exception of mild weakness in the intrinsics on the left.  Dr. Gold further interpreted the results of Plaintiff's November 2005 EMG to reveal moderate-to-severe bilateral focal median neuropathies at the wrist, as well as moderate-to-severe focal left ulnar neuropathy.  He found chronic and active left C5 and an old C7 bilateral radiculopathy, and possible C6 involvement.  (R. 186.)  Dr. Gold noted that there appeared to be multiple pathologies contributing to Plaintiff's symptoms, and that he had a left ulnar component which by report was severe and was not likely to improve with physical therapy or medications.  (R. 186.)

On June 6, 2006, Dr. Gold conducted another follow-up.  He noted that the results of a recent MRI showed a good post-operative appearance, but that Plaintiff reported "ongoing numbness in the upper extremities" in both hands.  (R. 188.)  Dr. Gold stated that he had asked Plaintiff to consider a carpal tunnel release and ulnar release on the left side, and a carpal tunnel release on the right side.

State Agency Physician.  On April 12, 2005, a state agency physician, Dr. Edmond Gardner, conducted a physical residual functional capacity assessment.  His assessment was for December 31, 2004, Plaintiff's date last insured.  Dr. Gardner opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours a day, sit about six hours a day, and had unlimited ability to push or pull.  (R. 147.)  He found that Plaintiff had positive signs of nerve root compression, muscle spasms, tenderness and decreased sensations and range of motion.  However, he found that

Plaintiff could still use his hands for minor items and tasks. (R. 147.) He also found that Plaintiff had no loss of strength, no atrophy of intrinsic hand muscles or upper extremities, and that his sensory changes were non ataomic. (R. 148.) Dr. Gardner also found limited gross and fine manipulation limitations, stating that frequent fine and gross manipulation was impaired. (R. 149.) He concluded that Plaintiff's symptoms were partly credible, but noted that Plaintiff had no loss of strength. (R. 151.) This opinion was confirmed by another state agency physician on April 12, 2005. (R. 153.)

Robert Thompson, M.D. On August 1, 2005, Dr. Thompson, a neurologist, examined Plaintiff for the Ohio Rehabilitation Services Commission's Bureau of Disability Determination. He stated that Plaintiff claimed to have been having difficulty using his hands since 1999, that Plaintiff denied any weakness, but stated that he did not have sensation and frequently dropped things. Dr. Thompson found that Plaintiff had no motor weakness, muscle atropy, or muscle fasciculations, and that his ability to grasp and manipulate with either hand was normal. Plaintiff reported diminished sensation to light touch in both hands. (R. 155.) Dr. Thompson diagnosed Plaintiff with bilateral carpal tunnel syndrome, mild right ulnar neuropathy, and status post surgery for cervical spinal stenosis. He concluded, "[b]ased on these objective findings, Mr. Shock would be unable to do any work that required forceful, repetitive use of his hands or fine manipulation with his hands. There is no objective impairment with sitting, standing, walking, or occasional use of his upper extremities." (R. 156.)

Functional Capacity Examination.  On October 28, 2005, Kristin Lindsey, PT, conducted a functional capacity examination of Plaintiff.  (R. 164.)  At his intake interview, Plaintiff claimed gradual onset of loss of hand use with numbness since July 1999, due to spinal stenosis.  The specialist found that Plaintiff "currently meets a Sedentary-Light level of physical demand.  He demonstrates no evidence of submaximal effort or symptom magnification behaviors other than his perceived level of function is less than actual test results.  He functions best at floor to shoulder level in bending, squatting, kneeling, sitting, standing, and walking with right hand.  He demonstrates difficulty with overhead level tasks with both arms and a majority of left had [sic] tasks due to impaired sensation."  (R. 167.)  The specialist recommended "current activities within a Sedentary-Light level of physical demand with restrictions as per attached functional test results.  Left hand activities should be limited due to weakness and impaired sensation while crawling should also be avoided."  (R. 167.)  She further found that Plaintiff's strength was limited in his left hand muscles, and that his sensation was impaired with constant numbness in his left third, fourth, and fifth fingers and that he had right hand intermittent numbness in glove distribution.  (R. 168.)  The specialist also noted that Plaintiff demonstrated no signs of symptom magnification behavior; his perceived physical demand level was less than sedentary, while his actual test results fell within the sedentary-light range with left hand restriction.  (R. 170)

Nerve Conduction Study.  On November 3, 2005, David Lacey, M.D. conducted a nerve conduction study of Plaintiff.  He concluded that multiple

abnormalities were present, including:

> "1. Bilateral, focal, median neuropathies at the wrists consistent with carpal tunnel syndrome. The right is moderate to severe. The left is moderately severe.
> 2. Moderate to severe, focal, left, ulnar neuropathy at the elbow.
> 3. Mild, chronic, active, left C 5 radiculopathy.
> 4. Old, C 7 radiculopathy bilaterally.
> 5. The changes in the left pronator teres are consistant with a healing versus chronic, low grade left C 6 radiculopathy, though C 7 root involvement could give this picture."

(R. 192.)

### Administrative Law Judge's Findings.

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2004.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 15, 1999 through his date last insured of December 31, 2004 (20 CFR 404.1520(b) and 404.1571, *et seq.*)

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the cervical spine with fusion surgery in February of 2005 and carpal tunnel syndrome (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work except that cannot perform overhead lifting or forceful gripping with either hand.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born on December 18, 1953 and was 51 years old,

which is defined as a closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11.    The claimant was not under a disability as defined in the Social Security Act, at any time from June 15, 1999, the alleged onset date, through December 31, 2004, the date last insured (20 CFR 404.1520(g)).

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. ..."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the

Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**. Shock argues that the ALJ erred in finding that Plaintiff could perform substantial gainful activity. He states that it is well-documented that his impairments cause periods of extended numbness in his hands, and that the examining physician confirmed that he would be unable to perform any work which required fine manipulations with his hands. Plaintiff argues that the ALJ took out of context, and exaggerated, a comment to Dr. Thompson that he "works on his computer", to support a conclusion that Plaintiff's testimony was not credible. (Doc. 11 at 4-6.)

**Analysis**.

The Commissioner's decision with respect to Plaintiff's use of his hands relies heavily upon Dr. Thompson's August 1, 2005 state agency examination and the October 28, 2005 functional capacity examination. The ALJ said specifically with respect to Dr. Thompson that:

> As for the opinion evidence, the opinion of Dr. Thompson is consistent with the weight of the evidence and is entitled to significant weight. This opinion is also consistent with the results of a functional capacity

evaluation performed in October of 2005 which concluded that the claimant retained the capacity to perform sedentary and light work activity. No other opinion supports finding, or purports to establish, a condition of disability within the meaning of the Social Security Act.

(R. 23.)

The ALJ's decision makes much of Plaintiff's statements that he was capable of working on his computer. (R. 22.) Plaintiff did not testify about his computer use at the hearing. In his January 13, 2005 function report, he wrote that his hobbies included "play on the computer [...] most of the time". He qualified this by commenting that since the condition began he "watches t.v. more. Can only play on the computer until hands fall asleep." (R. 96.) In his evaluation letter of August 1, 2005, Dr. Thompson stated, apparently reporting Plaintiff's comment to him, that "[i]n a typical day, he works on his computer." At his October 28, 2005 functional capacity evaluation intake interview, Plaintiff commented that his typical day comprised "[g]etting dressed, grooming with assist, watch TV, use computer." (R. 166.)

Based upon this information, the ALJ stated that "the claimant alleged that he has significant difficulty using his hands, but reported to Dr. Thompson that he spends a typical day working on his computer." (R. 22-23.) Thus, concluded the ALJ, Plaintiff's claims about the use of his hands were not entirely credible. The Commissioner's finding in this respect is unreasonable. Plaintiff testified at the hearing that, at intervals, he would lose the use of his hands for periods of time ranging from 10-15 minutes to two hours. This alleged incapacity – periodic

numbness, not constant numbness – is not incompatible with the recreational computer use which Plaintiff reported. It is clear that the ability to "play on the computer" at one's own pace and for one's own amusement does not require the same dependable fine motor skills that an employer would require. Plaintiff's reported ability to use his computer is not incompatible with his claims that he periodically loses the use of his hands. Furthermore, this was apparently the only specific basis for the ALJ's finding that Plaintiff's allegations were not credible. The ALJ did not otherwise comment on Plaintiff's credibility or report his observations of Plaintiff at the hearing.

The findings of the Commissioner were predicated upon the conclusion that, although he could not perform forceful gripping, Plaintiff had essentially constant use of his hands, and retained the ability to perform light work. This conclusion is at odds with the opinion of Dr. Thompson – an opinion which the ALJ characterized as "consistent with the weight of the evidence and entitled to significant weight" – that Plaintiff "would be unable to do any work that required forceful, repetitive use of his hands or fine manipulation of his hands." (R. 156.) It is at odds with the functional capacity examination, which found that he had constant partial numbness in his left hand and intermittent numbness in his right hand. It is also at odds with Plaintiff's uncontroverted testimony as to his abilities.

The Court cannot find that the determination of the Commissioner as to Plaintiff's ability to use his hands was based on substantial evidence. The record, taken as a whole, does not support the conclusion that Plaintiff retains the

functional capacity to perform light work excepting overhead lifting and forceful gripping.  Instead, it supports the examining physician's conclusion, which is that Plaintiff lacks the ability to do any work which requires forceful, repetitive use of his hands or fine manipulation of his hands.  This impairment apparently existed before his date last insured, as the ALJ found.  (R. 22.)

Therefore, I **RECOMMEND** that this matter be **REMANDED** to the Administrative Law Judge for further proceedings, including a determination, utilizing the testimony of an impartial vocational expert, of whether Plaintiff is able to perform substantial gainful work, considering Plaintiff's residual functional capacity, age, education, and work experience.  This determination shall take into account a finding that Plaintiff lacks the ability to do any work which requires forceful, repetitive use of his hands or fine manipulation of his hands.

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgement of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892

F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel
United States Magistrate Judge
